IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :        CRIMINAL ACTION
                                  :        NOS. 11-274-01
     v.                           :
                                  :
ANTHONY BURNETT                   :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                              July 8, 2013


        Defendants Anthony "Ant" Burnett (Defendant Burnett)

and Raheem Hankerson (Defendant Hankerson, collectively,

Defendants) were jointly charged by a grand jury as follows:

Count I, conspiracy to rob a jewelry store with a firearm in

violation of 18 U.S.C. §§ 1951(a), (b)(1), and (b)(3); Count II,

robbery of a jewelry store with a firearm in violation of 18

U.S.C. §§ 1951 and 2; Count III, using and carrying a firearm in

relation to a crime of violence in violation of 18 U.S.C. §§

924(c)(1) and (2); and Count IV, possession of a stolen firearm

in violation of 18 U.S.C. § 922(j) and 2. Defendant Burnett was

also individually charged in Count VI with possession of a gun

by a convicted felon in violation of both 18 U.S.C. §§ 922(g)(1)

and 924(e).[1] Before the Court is Defendant Burnett's motion to suppress his statements given to the police.

On September 29, 2011, Defendant Burnett filed his motion to suppress. Def. Burnett's Mot. to Suppress, ECF No. 36. On October 3, 2011, the Government filed a response thereto. Gov't's Resp. to Def. Burnett's Mot. to Suppress, ECF No. 38. Following several hearings, on January 20, 2012, the Court requested additional briefing, which was submitted on February 29, 2012. Gov't's Supp. Resp. to Def. Burnett's Mot. to Suppress, ECF No. 61.

Thereafter, on April 11, 2012, the Court heard oral argument. However, on May 2, 2012, Defendant Burnett requested a substitution of counsel, and the Court granted this request. On July 25, 2012, Defendant Burnett—through current counsel—requested that the Court revisit his motion to allow him to present additional evidence, including his medical records and testimony from an expert in pharmacology. The Court granted this request, and on December 10, 2012, held an evidentiary hearing, during which the Court heard testimony from Defendant Burnett's

---

[1] Defendant Hankerson was separately charged in Count V with possession of a gun by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Because of the felon-in-possession charges, both defendants also face forfeiture of the firearm and ammunition involved in the above-referenced offenses, per 18 U.S.C. § 924(d) and 28 U.S.C. § 2461(c).

proffered medical expert, Dr. David M. Benjamin. <u>See</u> Letter from David Benjamin, M.D., to Chambers (Aug. 13, 2012), ECF No. 98, at 1-10 (hereinafter Dr. Benjamin Letter); Curriculum Vitae of David Benjamin, M.D., ECF No. 98, at 11-35 (hereinafter CV). Thereafter, the Court instructed the Government to submit proposed findings of fact and conclusions of law. Gov't's Second Supp. Resp. to Def. Burnett's Mot. to Suppress, ECF No. 112. Defendant Burnett also filed a supplemental memorandum in support of his motion to suppress. Def. Burnett's Mot. to Supp. Mot. to Suppress, ECF No. 113. Accordingly, Defendant Burnett's motion to suppress his confession is now ripe for disposition.[2] For the reasons that follow, the Court will grant Defendant Burnett's motion.[3]

---

[2]       The Court already resolved several of Defendants' pretrial motions and thus assumes familiarity with the facts of the case. <u>See</u> Order and Mem. Op., Aug. 1, 2012, ECF Nos. 89-90 (denying Defendants' motions to suppress evidence found in vehicle and Defendant Hankerson's motions to suppress evidence found at his residence and his statement given to police). However, the Court deferred ruling on Defendant Burnett's present motion to suppress his confession, as the Court granted Defendant Burnett leave to reopen the motion. Order, July 31, 2012, ECF No. 88.

[3]       This Memorandum constitutes the Court's findings of fact and conclusions of law regarding Defendant Burnett's motion.

# I.  **FACTS**[4]

On March 29, 2011, Defendants allegedly robbed Poland Jewelers at 4347 Main Street in the Manayunk section of Philadelphia.[5] During the robbery, one defendant bound the clerk and storeowner with plastic zip ties and at one point struck the owner across the head with a semiautomatic handgun. Following Defendants' departure, the victims notified the police. In addition to store merchandise, Defendants also allegedly stole the security tape, a revolver that was kept under the store cash register, and some of the victims' personal effects.

Following the robbery, Defendants allegedly fled in a black Honda with Defendant Hankerson at the wheel.[6] Unfamiliar

---

[4]     The abbreviated facts recited here are taken from the Court's Memorandum Opinion following the suppression hearing in this case, dated August 1, 2012. See Mem. Op., Aug. 1, 2012; see also Suppression Hr'g Trs., Dec. 16, 2011, to Jan. 20, 2012, ECF Nos. 57-58. Where relevant, the Court includes additional findings based on the parties' submissions as well as testimony and other evidence presented during the December 10, 2012, hearing. See Suppression Hr'g Tr., Dec. 10, 2012, ECF No. 108.

[5]     From the testimony and documentary evidence offered in this case, excluding the statements that Defendants gave to police officers, it is unclear which defendant entered the store first. Resolution of this issue, however, is unnecessary, as these facts constitute background information only and are not material to disposing of Defendant Burnett's motion.

[6]     The parties do not dispute that Defendant Hankerson drove the Honda. Indeed, at Defendant Hankerson's insistence, Defendant Hankerson's girlfriend, Shavon Adams, reported the Honda stolen. Adams, however, changed her mind and told police

with the neighborhood, they became lost and drove down a dead-end street—the 200 Block of Kalos Street. After a witness refused to provide a ride, Defendants abandoned the car, leaving the contents behind. A witness then called 911 to report the incident.

The police responded to the Kalos Street report,[7] interviewed the witnesses, who described the Honda's occupants as African-American males with one wearing a similar coat as described by the robbery victims, and determined that the Honda was registered to 5812 North Lambert Street. Ultimately, the police impounded the vehicle and, pursuant to a warrant, searched the vehicle, uncovering items connected to the robbery as well as various identification documents belonging to Defendant Hankerson.

Thereafter, the police obtained a warrant to search Defendant Hankerson's residence, 5812 North Lambert Street, and a warrant to arrest Defendant Hankerson. However, on April 5, 2011, Defendant Hankerson surrendered himself to the Federal Bureau of Investigation. Defendant Hankerson was transferred to

detectives later that Defendant Hankerson had borrowed her car the day of the robbery.

[7]     Officers Christopher Ward and Anthony Lynch both responded to the Kalos Street incident, and their testimony is generally consistent.

the Philadelphia Police Department, where Detective Ted Wolkiewicz interviewed him.[8] During the interview, Defendant Hankerson implicated Defendant Burnett in the robbery.

The next day, an arrest warrant issued for Defendant Burnett. On April 30, 2011, police encountered Defendant Burnett. After Defendant Burnett brandished a knife, a gun fight ensued between the police officer on the scene and Defendant Burnett, wherein he sustained a gunshot wound to the chest. Defendant Burnett was eventually subdued.

On May 2, 2011, at approximately 9:50 a.m., while in the hospital recovering from the gunshot wound, Defendant Burnett was questioned by Detective Wolkiewicz about the robbery.[9] Prior to speaking with Defendant Burnett, Detective Wolkiewicz testified that he knew little about Defendant Burnett's condition—other than that he had been shot—and testified that before entering Defendant Burnett's room, he

---

[8]     Detective Ted Wolkiewicz was assigned to the case. He obtained the search warrant and recovered the items in the Honda.

[9]     Two additional people were present: a Philadelphia Police Detective and an FBI Task Force Officer.

spoke only with a nurse who said that Defendant Burnett was

"fine to talk."[10]

Detective Wolkiewicz testified that he advised

Defendant Burnett of his constitutional rights, which Defendant

Burnett waived in writing. Specifically, Detective Wolkiewicz

read Defendant Burnett a department-issued card, which described

his Miranda rights, and then asked a series of seven follow-up

questions designed to assess Defendant Burnett's understanding

of his rights.[11] Defendant Burnett wrote his answers and initials

next to each question on the waiver form and then signed and

dated the form. Gov't's Supp. Resp. to Def. Burnett's Mot. to

Suppress, Ex. 6.

---

[10] On cross-examination, Detective Wolkiewicz testified
that his discussion with the nurse was brief and general in
nature. Detective Wolkiewicz testified that he did not inquire
regarding what, if any, medical procedures Defendant Burnett had
received, nor did he inquire regarding what, if any, pain
medication Defendant Burnett was receiving. Hr'g Tr., 8:5-14,
Jan. 20, 2012.

Regarding Defendant Burnett's medical condition
following the shooting, the parties have stipulated as follows:
"Defendant Burnett was taken to Temple Hospital on April 30,
[2011,] with gunshot wounds to the chest. He was, in fact,
operated on that day. On May 1st, [2011,] he . . . had a chest
tube placed to aid his breathing." Id. at 108:11-20.

[11] Defendant Burnett does not appear to challenge that
Detective Wolkiewicz read him his rights or that the warnings
were insufficient. Further, Defendant Burnett does not argue
that his statement was the product of coercion.

Detective Wolkiewicz then proceeded by first asking several questions regarding basic identifying information. Next, Detective Wolkiewicz asked Defendant Burnett if he was under the influence of drugs or alcohol. Defendant Burnett responded that he had been given morphine but that he was aware of his surroundings.

Regarding Defendant Burnett's demeanor, Detective Wolkiewicz testified that he appeared alert and that there were no signs that he was confused, having difficulty understanding, slurring his speech, or any other evidence that he was not fully comprehending the conversation.

Satisfied that Defendant Burnett was alert and coherent, Defendant Wolkiewicz permitted him to give a six-page statement regarding the robbery. Detective Wolkiewicz noted that, during the questioning, Defendant Burnett indicated that he did not wish to discuss certain topics. For example, Defendant Burnett stated that he did not want to discuss Defendant Hankerson's involvement in the robbery. At the conclusion of this portion of the interview, at approximately 10:50 a.m.,[12] Defendant Burnett declined to sign the statement,

---

[12]     Detective Wolkiewicz testified that, between approximately 10:20 and 10:30, he took a break in questioning so that Defendant Burnett could go to the bathroom.

indicating that he preferred to write his own statement about the robbery.[13]

After discussing the robbery, Detective Wolkiewicz questioned Defendant Burnett about his arrest and the shooting. Similarly, after concluding this portion of the interview, Defendant Burnett again refused to sign the statement, repeating his preference of writing a statement in his own words.

During the December 10, 2012, hearing, Defendant introduced medical records from his treatment for the gunshot wound. Hr'g Ex. D-3, Dec. 10, 2012; see also Dr. Benjamin Letter 2-3. These medical records show that, at the time Detective Wolkiewicz interviewed him, Defendant was receiving intravenous morphine through a patient-controlled anesthesia machine (PCA machine), which allows a patient to self-administer a prescribed dosage of the pain medication at specific intervals. Defendant Burnett's PCA machine was set to administer a 1 milligram dose of morphine with a lockout interval of six minutes. Thus, the PCA machine allowed him to self-administer a maximum of 10 milligrams of morphine per hour. On May 2, 2011, from 6:00 a.m. until 10:00 a.m.—roughly the time he began the interview with Detective Wolkiewicz—Defendant Burnett had received 20

---

[13]     The statement that the Government seeks to introduce is the "transcribed interview." Def. Burnett's Mot. to Supp. 5.

milligrams of morphine and indicated a pain-rating score of 2 out of a possible 10.

Regarding medical personnel's observations of Defendant Burnett's condition on May 2, 2011, his records show that, throughout the day, several nurses reported that he was "awake, alert, and oriented."[14] Hr'g Tr., 34:20-35:13, 37:25-39:15, 42:16-43:5, Dec. 10, 2012. Also on May 2, 2012, a nurse performed a neuropsychiatric examination and reported that Defendant Burnett's responses were normal other than exhibiting a "flat affect."[15] Id. at 36:2-7, 40:12-42:10. Additionally, at approximately 8:30 that morning, a social worker interviewed Defendant Burnett, and her report does not indicate that he was unresponsive or otherwise impaired. Id. at 36:2-37:18. Lastly, Defendant Burnett's records included his treating physician's discharge summary, which states as follows: "You have received drugs for your comfort during your stay. These can interfere with your ability to drive a car or operate power equipment.

---

[14]     During the hearing, Dr. Benjamin testified that, in the medical field, "awake, alert, and oriented," or "AAO," has a special significance: it means that a person knows his name, where he is—that is, in the hospital—and what time or what day it is. Hr'g Tr. 39:5-10, Dec. 10, 2012.

[15]     Dr. Benjamin testified that a "flat affect" is "characteristic of a morphine effect." Hr'g Tr., Dec. 10, 2012, 42:8-10.

They can also interfere with decision-making. Please defer any of these activities for 24 hours." Id. at 43:15-47:4.

At the December 10, 2012, hearing, Defendant Burnett called Dr. David Benjamin to testify, proffering him as an expert in forensic toxicology and pharmacology.[16] See Dr. Benjamin Letter & CV; Hr'g Tr., Dec. 10, 2012. Consistent with the opinion stated in his letter to the Court, Dr. Benjamin opined that, while under the influence of morphine, Defendant Burnett could not have given a knowing, intelligent, and voluntary waiver of his constitutional rights. Specifically, Dr. Benjamin testified that because Defendant Burnett was receiving intravenous morphine—a pain-relieving drug known to cause, among other side effects, sedation or impairment of mental functions— Defendant Burnett would not have been permitted to give informed consent for a medical procedure; consent after receiving morphine would generally be considered invalid. Accordingly, Dr. Benjamin opined that Defendant Burnett's statement to the police should likewise be considered invalid.

---

[16] During the December 10 hearing, the Court conditionally qualified Dr. Benjamin as an expert in the fields of forensic toxicology and pharmacology based on his education, skill, and experience. Hr'g Tr. 8:15-18, Dec. 10, 2012. The Court instructed the Government that it could move to withdraw this qualification at the conclusion of the hearing. Id. at 8:15-18. The Government did not do so. Thus, the Court recognizes Dr. Benjamin as an expert in the above-referenced fields and has considered his testimony accordingly.

Dr. Benjamin based his opinion on four things: (1) his own training; (2) his research of the medical-legal paradigm regarding the administration of mind-altering drugs and obtaining informed consent; (3) his knowledge of morphine's commonly known pharmacological effects; and (4) his review of Defendant Burnett's medical records. Dr. Benjamin testified that he did not personally interview any of the medical staff that treated Defendant Burnett.[17]

## II.  APPLICABLE LAW

Well-entrenched in modern criminal law, police officers now routinely issue Miranda warnings. Miranda warnings safeguard the methods by which law enforcement officers obtain statements during custodial interrogations; ultimately, the warnings serve as a prophylactic protection of a criminal defendant's Fifth Amendment right against compelled self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 444 (1966) (holding that "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial

---

[17]     The Court notes that Dr. Benjamin testified regarding the effects of morphine, generally, which he explained can vary from person to person based on a variety of factors. Dr. Benjamin did not opine regarding Defendant Burnett's personal sensitivity to morphine or regarding Defendant Burnett's prior drug history.

interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination").

Of course, an individual may waive his Fifth Amendment right provided that the waiver is knowing, intelligent, and voluntary. Id. at 475. In assessing a waiver, the Court's inquiry is twofold: "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421-22 (1986). On review, the Court assesses a waiver against the totality of the circumstances. Withrow v. Williams, 507 U.S. 680, 693-94 (1993).

A written waiver is strong proof of the waiver's validity; notably, however, a writing is neither necessary nor sufficient to sustain the Government's burden of proving waiver. See North Carolina v. Butler, 441 U.S. 369, 373 (1979) (rejecting per se explicit statement of waiver as prerequisite to establishing waiver; no such explicit statement of waiver required). Assessing whether a defendant has waived his rights is a fact-intensive determination based on the totality of the

13

circumstances, including the background, experience, and conduct of the accused. Id. at 374 (citing United States v. Washington, 431 U.S. 181, 188 (1977); Schenckloth v. Bustamonte, 412 U.S. 218, 226 (1973); Frazier v. Cupp, 394 U.S. 731, 739 (1969); Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

In reviewing the voluntariness of a confession, the Third Circuit assesses whether the Government proved by a preponderance of the evidence that the defendant's will was not overborne. United States v. Dutkiewicz, 431 F.2d 969, 1970 (3d Cir. 1970); see also United States v. Arcediano, 371 F. Supp. 457, 465 (citing Dutkiewicz, 431 F.2d at 970) (discussing legal standard for proving voluntary confession).

Other circuits have applied a similar fact-based inquiry when assessing the validity of a defendant's waiver and confession. See United States v. Smith, 608 F.2d 1011, 1012 (4th Cir. 1979) (holding that "test of whether a person is too affected by alcohol or other drugs (to) voluntarily and intelligently [] waive his rights is one of coherence, of an understanding of what is happening"); see also United States v. Cristobal, 293 F.3d 134, 141-42 (4th Cir. 2002) (finding defendant's waiver voluntary even though he had been given pain medication, including morphine, because defendant was "alert and coherent" during interview); United States v. Short, 947 F.2d

1445, 1450 (10th Cir. 1991) (upholding statement as voluntary
where defendant, who had ingested pain medication, demonstrated
ability to think and converse freely and intelligently). Indeed,
in its Supplemental Response, the Government lists other circuit
cases finding valid waiver despite arguably more compelling
facts suggesting the contrary. Gov't's Supp. Resp. 30 n. 9; see,
e.g., United States v. Curtis, 344 F.3d 1057, 1065-66 (10th Cir.
2003) (holding valid waiver where defendant allegedly
intoxicated and slurring speech but freely gave waiver with "no
indication that his will was overborne"); United States v.
Solis, 299 F.3d 420, 439-40 (5th Cir. 2002) (affirming valid
waiver despite defendant's testimony that he "did some speed"
and did not remember Miranda warnings because detective saw no
indication defendant was under influence of drugs); United
States v. Walker, 272 F.3d 407, 412-13 (7th Cir. 2001) (finding
waiver valid even though obtained while defendant was vomiting
during heroin withdrawal, because doctor said defendant was
alert and defendant did not complain of feeling ill).[18]

---

[18] Notably, courts appear less sympathetic to waiver
challenges due to self-induced intoxication (from alcohol or
drugs) than hospital or physician-administered medication.

## III. DISCUSSION

Defendant Burnett argues that his statements should be suppressed because the waiver was not knowing, intelligent, or voluntary.[19] The cornerstone of Defendant Burnett's argument is that the morphine vitiated his waiver. In essence, Defendant Burnett's motion appears to invite the Court to adopt a per se rule categorically precluding a defendant's morphine-induced confession as not knowing, voluntary, or intelligent.[20]

---

[19]    As previously noted, Defendant Burnett does not appear to allege that his statements were involuntary or the product of coercion. Also, the parties agree that Defendant Burnett was subject to a custodial interrogation. Thus, the issue before the Court is whether the morphine prevented Defendant Burnett from giving a knowing, intelligent, and voluntary waiver.

[20]    In support of the "mistrust we should all have of confessions taken while a suspect is actively being administered morphine," Defendant calls to the Court's attention the notorious and racially-charged cases, Beecher v. Alabama, 389 U.S. 35 (1967) (Beecher I) and Beecher v. Alabama, 408 U.S. 243 (1972) (Beecher II). Def.'s Mot. to Supp. Mot. to Suppress 11 n.11. (also citing Townsend v. Sain, 372 U.S. 293 (1963), overruled on other grounds by Keeney v. Tamayo-Reyes, 507 U.S. 1 (1992) (recognizing that, if proven, petitioner's claim that he was interrogated while under influence of hyoscine, or "truth serum," would constitute deprivation of constitutional rights)).

The facts in this case, however, do not amount to the egregious facts at issue in the above-referenced cases. In the Beecher cases, the police obtained a confession immediately after having shot a fleeing suspect in the leg and chasing him down, and then, after giving him an injection of pain medicine, told him that "it would be best to sign the papers before the gang of people came there and killed him." Beecher I, 389 U.S. at 37-38 (holding that these facts, namely that "petitioner, already wounded by the police, was ordered at gunpoint to speak

The Court refuses to adopt a categorical rule precluding all morphine-tainted confessions. But the Court does find that, on the facts of this case, the Government has failed to meet its burden to show that Defendant Burnett's waiver was knowing, voluntary, and intelligent. This finding is based on a lack of medical evidence rebutting Defendant Burnett's expert witness, the amount of morphine ingested, and the close temporal relationship among Defendant Burnett's surgery, morphine ingestion, and interrogation.

In a factually similar case, Judge DuBois held that, notwithstanding having taken morphine and Percocet, the defendant was coherent and able to waive his Miranda rights. United States v. Adamson, No. 04-672, 2008 WL 167299, at *7 (E.D. Pa. Jan. 16, 2008) (Dubois, J.).[21]  In Adamson, the

---

his guilt or be killed," led to the "inescapable conclusion that the petitioner's confessions were involuntary").

At issue in Townsend was whether the combined hyoscine and phenobarbital injection given to the petitioner—allegedly to reduce the effects of withdrawal symptoms—equated to a "truth serum," thus rendering his confession the product of an overborne will. Townsend, 372 at 306-08. Thus, Defendant invites the Court to equate morphine with "truth serum," a categorical position unprecedented in this Circuit.

[21]     While at the hospital, the defendant had received four milligrams of morphine for pain. According to the medical evidence, this was a standard dose for a person weighing 70 kilograms or more, sufficient to provide pain relief but not cause loss of conscience. Adamson, 2008 WL 167299, at *7

defendant was questioned regarding a shooting following hospital treatment for his gunshot wound.[22] Evidence adduced included statements from medical personnel suggesting that during his hospital stay, the defendant was alert and functioning, notwithstanding his injury. Id. at *1.

Once discharged and taken to the police station, a detective read the defendant his Miranda rights and obtained a written waiver. Id. at *3. Thereafter, the detective interviewed the defendant for approximately thirty minutes. Id. (reviewing questions, including whether defendant was under the influence of drugs or alcohol, to which defendant responded "nope"). The defendant confessed, and then concluded by stating "I don't want to talk anymore." Id. Notwithstanding the defendant's Miranda challenges and proffered medical-expert testimony suggesting that the drugs impacted his capacity to waive his rights, Judge DuBois ultimately found that the defendant was coherent and

---

(referencing physician's note that morphine had no effect on defendant's cognitive abilities, and that half-life for morphine is two to four hours). Prior to being discharged, the defendant was given two Percocet tablets. Id. at *2.

[22]     After receiving permission from the hospital staff, the police did briefly question the defendant while in the hospital, but Judge DuBois found that this questioning did not constitute custodial interrogation triggering Miranda. Id. at *6, *9.

competent enough to knowingly, intelligently, and voluntarily waive his rights.

Although the Adamson Court's reasoning is persuasive, the facts are distinguishable. Indeed, Defendant cites Adamson in his brief, arguing that the facts in this case compel a different result. Def. Burnett's Mot. to Suppress 10-11. The Court agrees.

Like Adamson, after Detective Wolkiewicz read him his rights, Defendant Burnett waived these rights both orally and in writing. Moreover, his answers to each of the seven follow-up questions suggest his understanding of his rights and the consequences of waiving them. Also similar to Adamson, Defendant Burnett's conduct during the substantive portion of the interview likewise suggests his competency. First, Defendant Burnett provided coherent, specific, and detailed answers to the substantive questions asked. However, although a commonly noted factor, Defendant Burnett's ability to recall details does not necessarily demonstrate his ability to appreciate the consequences of revealing these details to the police.

On the other hand, unlike in Adamson, here, hospital personnel did not testify, nor has the Government offered medical evidence directly addressing Defendant Burnett's

cognitive status on the day in question.[23] Detective Wolkiewicz did not ask the hospital staff any questions regarding Defendant Burnett's overall condition or the morphine's effect on him. Hr'g Tr., Jan. 20, 2012, 6:18-8:14, 12:17-13:18; see also Gov't's Supp. Resp. to Def. Burnett's Mot. to Suppress 22 (noting only that Wolkiewicz asked whether he could speak with Defendant Burnett). The Government relies heavily on Detective Wolkiewicz's testimony to prove Defendant Burnett's mental state. C.f. Morris, 287 F.3d at 989 (noting that detective asked physician whether suspect could give statement). But Detective Wolkiewicz has no specialized experience in forensic toxicology or pharmacology, and his testimony does little to rebut Defendant's medical expert.

Additionally, unlike the defendant in Adamson—who had received 4 milligrams of morphine (which terminated a few hours prior to questioning)—here, the defense's medical expert, Dr. Benjamin, reports that Defendant Burnett received an average of 5 milligrams of intravenous morphine per hour, which continued during questioning. Dr. Benjamin Letter 3. In his letter, Dr.

---

[23]     Notably the medical personnel statements that Defendant Burnett was "awake, alert, and oriented" constitute weak evidence in support of the Government's burden. According to Dr. Benjamin, to have accurately assessed his cognitive abilities, Detective Wolkiewicz should have administered tests similar to those used in the field when assessing sobriety.

Benjamin concluded that this amount, yielding a pain-rating score of 2 out of 10, indicating good pain relief, was enough to impair cognitive functions. The Court will credit Dr. Benjamin's conclusion that Defendant Burnett "was in a condition where he was not capable of making important cognitive decisions on his own when he waived his Miranda rights, and agreed to be interviewed by Detective Wolkiewicz." Id. at 6-7.[24]

As Judge DuBois noted, "a defendant's mental capacity—that is, his ability to understand the 'nature of the right being abandoned and the consequences of the decision to abandon it'"—can be affected by pain and the effects of pain medication. Adamson, 2008 WL 167299, at *8 (quoting Morris, 287 F.3d at 989). Also importantly, Detective Wolkiewicz interviewed Defendant Burnett shortly after he had received major surgery, yet seemingly without any time-sensitive need to have done so. Absent exigent circumstances, questioning a suspect regarding criminal activity after major surgery while he is under the influence of morphine is at least arguably in tension with

---

[24]     Dr. Benjamin states that the treating physician, Dr. Pathak, shared the same opinion. In support of this conclusion, Dr. Benjamin cited the discharge instructions, which stated: "You have received drugs for your comfort during your stay. These can interfere with your ability to drive a car or operate power equipment. They can also interfere with decision-making. Please defer any of these activities for 24 hours." Dr. Benjamin Letter 6.

conceptions of due process and the Fifth Amendment's procedural protections jealously guarded under <u>Miranda</u>.

The facts in this case are admittedly close. While Defendant Burnett's expert medical evidence is persuasive, Dr. Benjamin's opinion was based largely on the generic effects of morphine, and the parties agree that no one performed "the gold standard" cognitive tests on Defendant Burnett. Moreover, such tests have not been required as a prerequisite to finding a valid waiver. But, ultimately, the Government has provided less supporting evidence than that in other cases where waiver has been found present.

## IV. CONCLUSION

Under the circumstances, the Court finds that the lack of medical evidence proffered by the Government, the amount of morphine Defendant Burnett had ingested at the time of the interrogation, and the short amount of time between major surgery and the interrogation show that the Government has failed to meet its burden of proving a knowing, intelligent, and voluntary waiver. For these reasons, Defendant's motion will be granted. An appropriate order will follow.